Mr. Cooley, we're ready when you are. My name is Thomas Cooley, and I represent the appellant Rocky Estes with my co-counsel Duncan Locke. May it please the Court. Mr. Estes' fraudulent concealment claim should not have been preempted by the District Court under the Buchman case by the Supreme Court. In the Buchman case, that case involved specifically whether or not the device manufacturer in that case had committed fraud with respect to what it had reported to the FDA in its pre-approval process through the 510K analysis. Here, we do not have a 510K submission for the Lanx Telluride system whatsoever. What we have is we have a multitude of component parts. Now, I will admit that those component parts were 510K approved. However, the system itself that was implanted into this gentleman's spine was not. Spinal fixation devices under the FDA guidelines are required to have 510K approval for the device itself. Was the 510K that was submitted applicable to the screws that failed? There was a 510K submitted for those pedicle screws that failed, Your Honor. But as those pedicle screws are a component part of a larger device, there was not. And as of 2010, or as early as 2010, Lanx has known that these particular pedicle screws fail between the screw head and the thread because of cyclic loading, which means when these screws are turned, they can fail at that point between the head and the screw. Therefore, that's why we need a 510K on a spinal fixation device so that the device and the component parts together can be tested. Even that would also include the minimally invasive tools that are required to install this device because those are also a part of the spinal fixation system, and we don't have any 510Ks on those specific tools. But your claim is for fraudulent concealment. Isn't the concealment relating to the FDA regulatory process? No, sir, it's not. What is the concealment? The concealment is a standalone Mississippi tort claim where there's a concealment of material fact in that. Lanx never represented to the doctor, the hospital, the public at large, or Mr. Estes himself that this device was not FDA approved. So there's not necessarily the violation of the FDACA is just an element to Mr. Estes' claim. And in fact, Your Honor, you authored an opinion called Schust v. Medtronic in 2014  where you specifically stated that fraud claims stand outside of the FDCA because a product that is sold by a manufacturer who conceals a material fact knowingly intentionally is a claim that escapes preemption because whether or not there's the FDCA or not, if a manufacturer of any product were to state or conceal, excuse me, make a misrepresentation or conceal a material fact, that is a state tort law claim that would exist without the FDCA. And that's what we have here. What's the concealment, that the screws were submitted for approval separately than the component that the screws were part of? No, Your Honor. What's the concealment? The concealment is that the spinal fixation system itself, the rods, the plates, the screws. All the components. All the components together as one unique device. There was no 510K approval. So what they did is they played Frankenstein with pre-approved device, with component parts that are already approved to make another device that had not been tested and not met the rigorous FDA requirements and was not based on a predicate device as a 510K approval would require under the medical device amendments of 1976. Where was the deviation from the manufacturing specifications for what was actually inserted? I didn't see any of that evidence being presented to the district court. There's two problems there. First of all, you don't just have to have a deviation from manufacturing specification. You can also, as the Court noted in its opinion, have a deviation from a performance standard. We have testimony in the record where Dr. Crosby testifies, the treating physician says these screws must last for six to twenty-four months in order for fusion to occur. So for this device to even be effective, it's got to last at least six months. This device failed in five months. If I'm looking at the complaint, fraudulent concealment count six, in paragraph fifty-eight, I'm not going to go through all of it, but paragraph fifty-eight, the defendant knew or was reckless in not knowing that its representations were false and that the system had never been approved. The system was not properly cleared by the FDA. So it all relates to the FDA process. Well, it relates to whether or not they submitted anything to the FDA. That's just a fact that supports our claim for fraudulent concealment. The concealment, like I was mentioning a minute ago in response to Judge Clement's question, was that the concealment was Mr. Estes never knew, nor did his doctor, nor did the hospital, nor anyone else, that this device was not FDA approved. Therefore, Mr. Estes could never give proper informed consent to his doctor when his doctor explained to him this is what we're going to do, this is the procedure we're going to use, this is the device we're going to use. There's no way that Mr. Estes could give his proper informed consent with this knowing material fact being concealed. Now, a minute ago we talked about manufacturing specifications and performance standards. Well, Your Honor, that goes back to our argument that we weren't able to obtain all the documents we requested in discovery. See, we requested the five, ten case, other five, ten case submissions that involved these screws. How about other equipment? Your Honor. I still haven't answered my question. Where was the deviation in the manufacturing process for this device? Not the submission to the FDA, but where is the specific flaw? Where's the deviation from what it should have been? Your Honor, we don't exactly know what that is. Because it's not in your brief, and it's not argued to the district court, and it's not argued to us. Your Honor, that is correct. It's not argued in that specific way that there is a manufacturing specification. But what is argued is that our expert could never determine what manufacturing deviation there was because these screws were never retained. Nor will we provide the evidence in discovery that we requested to see these other complaint files where these pedicle screws were used to show historic performance failures and things of that nature to give our expert an opportunity to testify and to make a realistic investigation into causation. We never could provide that because we don't have the screws. I thought they provided you screws that were the same. They provided us 27 complaints, Your Honor. There were over 400 different complaints. And, in fact, one of the complaints that we reviewed, there was a doctor in there talking about other revisions with that specific patient. And in that specific revision, this is referenced in my brief, in my reply brief, he talks of that doctor references these other claim numbers, these other issues. We were never produced those. That in and of itself shows that there's other documents in that file that we have requested that have been withheld. But did you ever receive screws? I know they were misplaced or lost after the surgery. Did they produce to you the same kind of screws that had been inserted in your client? No, Your Honor, they did not. They didn't produce us any screws at all. And on that issue, they had an agent, Mr. Allen Russell, there at the surgery. Right. He was bringing the new device. Well, Your Honor, we don't really know what he was doing because he says he doesn't recall. That's what his testimony is in the record, is that he doesn't recall. And it's been extrapolated to say he was just there bringing in the hardware. We don't know what he was there for. But his contractual obligation with LANEX. But wouldn't you have just been there watching? You had to have a function. They don't let you in the operating room for nothing. Your Honor, regardless of whether he was there watching, he was there. And Randy Fesmeyer, LANEX's 30B6 representative, says if he's there, he has a So, in other words, he has an obligation to make himself knowledgeable about what's going on in this surgery. And the medical records specifically state there is a screw fracture, and that was one of the specific reasons why this device was being removed. Under his contract, it specifically lists, and this is highlighted in a footnote in my brief that cites the specific language, Distributors shall promptly inform LANEX in the writing of any complaints, or problems, or request the technical assistance received by potential customers regarding the devices. So, if there's any problem, any complaint, Alan Rasool has a duty to report that to LANEX. He failed to do that. These broken screws, this hardware, that's undeniably relevant to future litigation. And when it's relevant to future litigation, there is a duty to preserve. A duty to preserve that cannot be delegated about. Mr. Rasool was there that day. The district court took him on his word that he didn't recall what happened or why he was there. In other words, the district court made a credibility determination without considering the other evidence in the record, one being his contract, B, the medical records. And with that, Your Honor, we have an issue that is a jury determination on whether or not there is bad faith or bad conduct or for whatever reason. Now, I've argued in my brief that the Fifth Circuit should adopt or take on a different stance with how it evaluates spoliation of evidence as it relates to bad faith or bad conduct. But even before we get there, we have a question of material fact as to whether Mr. Alan Rasool acted badly in bad conduct or in bad faith. And the judge cannot simply make that determination on the credibility of Mr. Alan Rasool's testimony. That is a determination for the judge, especially when we have this other evidence in the record that would cast doubt upon why he was there in the first place. Now, as to the spoliation issue there, that would have a bearing on Mr. Estes' manufacturing defect claim. It would have a bearing on it that you can use circumstantial evidence to show a deviation or a deviation from a performance standard. And here, the doctor did testify that under performance standards, this screw would have to have lasted longer than six months, and it only lasted five. So right there is a clear, with the circumstantial evidence provided that we have the doctor's testimony, we have the medical records, that there's a deviation from a performance standard, then we have a question of fact that the district court didn't even address even though she specifically mentioned performance standards in her opinion. Mr. Estes should also have been allowed to conduct that further discovery to provide more information on his claims. He requested additional 510K filings that used those same component parts, and it's necessary to have those, as our expert testified in his affidavit, because we have to know how it failed. And to know how it failed, we can't just look at complaints involving pedicle screws. We also have to see if there's something involved with those plates and how those plates moved, because if those plates moved a certain way, maybe they're what broke the screw. We don't know. All we do know is that since 2010, Lennox knew that there was a weak spot between that head and that thread, and it would break under cyclic loading. Therefore, we also need to know information as it relates to the minimally invasive tools that were used, because those tools will have a bearing on that cyclic loading. And so if they knew that there was some cyclic loading problems, their complaint files, their complaint records, their 510K submissions respective to that issue would show our expert and give him a basis for causation testimony to articulate a deviation from manufacturing specification. I didn't get your reasoning of why Buckman and the line of cases don't apply. Okay. Your Honor, the Buckman line of cases does not apply, because in Buckman there was, in that case, there was not a freestanding state tort claim upon which the plaintiffs relied on. They solely stated that there was fraud based on deviations from the FDA regulations. And so what they were saying is that we have a freestanding federal cause of action because of these deviations. Whereas here with Mr. Estes, we're not, and specifically in that case in Buckman, the plaintiffs were saying you defrauded the FDA. They didn't say you defrauded me. They're saying you defrauded the FDA. Now, here we specifically have alleged that Mr. Estes himself was defrauded because of the concealment of a material fact being that the telluride system was not excluded. So the reason why Buckman does not apply in this instance is because we have a freestanding state tort-based claim, and the Fifth Circuit has already stated in Hughes v. Boston Scientific, if you have a freestanding tort claim that can exist outside of the federal drug and cosmetic act. Does a state tort claim exist outside of the FDA approval if it's all based on this premise that the approval was done through the improper mechanism? Well, therein lies the point, Your Honor. We don't even get the preemption because we don't have, the telluride system doesn't have a 510K. They don't have a PMA. So they can't rely on preemption for that device because there's nothing there for them to rely on. They didn't comply with the federal regulations. And as it states in Regal Medtronic, the Supreme Court case that was done after Buckman in 2008, I believe, if you don't have that compliance with those federal regulations, you don't even get to argue preemption. But as I stated earlier as referenced in the opinion that you wrote in Hughes v. Medtronic, we exist outside of the FDCA because our fraud claim is a state tort claim that exists without the FDCA. All right. You saved some rebuttal time. Thank you, Your Honor. Mr. Smith, why don't you start with Buckman? Start with the Buckman case. I'm Bradley Smith. May it please the Court. I'm Adria Jaton. We represent Lanks. I'll start with the Buckman analysis that I think is imperative that this Court focus on. But first, I want to clear up the record. It is undisputed that all of the hardware, all of the parts that were implanted in Mr. Estes were submitted to the FDA and cleared by the FDA. That's undisputed in this case. But were they submitted part by part or as a device? We produced six 510K submissions. One of those submissions included the actual type of pedicle screw, which is a cantilated screw in this case. The prior submissions included other hardware that was used. And in the 07 510K submission, which was four years before this surgery, that 510K clearly communicated that the cantilated screws at issue in this case were to be used in conjunction with other parts that were utilized in Mr. Estes' back, the rods and the brackets. It was clearly communicated that that was an integrated system and that the doctors would implant those devices with other devices. And it's one of those, and I know the Court's probably familiar with it, when the doctor gets in there and determines what rod he's going to use, what screw, what plate, depending on the patient and specifics of the vertebrae that he's dealing with. So there's no question that the part had been cleared and all other parts had been cleared. That is undisputed in this case. There was no 510K on the entire device? There was a 510K by part number, as they were all done, and included the screw part number and all of the other hardware part numbers. And it was contemplated that those would all be used in an integral system. It was not an independent 510K just for the screw. To see if I understand this, only after the doctor opens him up, does he select the various parts to put in? Well, the doctor may choose a certain surgery technique where he knows he's going to use a certain combination, but these hardware pieces are there, and the doctor selects what size screw, what rod, what plate. All of those parts have been cleared in 510K submissions. So until he puts them together, there's not a single device, or is that wrong? The device for this type of surgery, he knows he is going to put in screws, he knows he's going to put in rods and plates, and he is doing that with cleared parts that had all been submitted through the 510K process. The claim that the plaintiffs, the novel claim that the plaintiffs present to this court is that it was not done, that the submission was not done as a brand or marketed Telluride system. That's not the way it's done at the FDA, and there's no evidence that that was ever done by any manufacturer. Their claim is, and I want to make sure the record is clear, those parts had been cleared by the FDA through an appropriate 510K submission. Their claim is that they believe they should have been submitted in a different way, that the sufficiency of that submission was inappropriate or failed. And so that is the classic Buckman case. Their claim is the classic Buckman case. That claim, the fraudulent concealment claim, and I think Your Honors are focused on, is fraudulent concealment of what? Just because the appellees present the claim as a state claim, regardless of how they label that claim, fraudulent concealment, however it is dressed up, the substance of the claim is what the court must focus on and is what Buckman instructs this court and other courts to do. And it's the analysis that the district court in this case underwent, and looking beyond the name or the label or the form of the claim, the district court found that the substance of the fraudulent concealment claim was whether or not Lanx fraudulent concealed the sufficiency of this 510K process, whether they concealed specifically that it was not cleared through a brand or marketed telluride name versus part number. That claim cannot and never has existed at Mississippi law. That claim is the type of claim that Buckman and all the other cases that describe that exception where preemption occurs is when that claim is purely a claim that is derived from the FDA and FDCA and that cannot exist unless those FDCA provisions are in place. Well, the fraudulent misrepresentations would have to have been made to the FDA. But this plaintiff is claiming that, well, no one told him that the entire component didn't have FDA approval. I mean, I can't even envision that it would matter. It's not a realistic fear that the component they're putting into your spine isn't FDA approved. Well, the fraudulent concealment, at first, only in their appellate briefs do they allege that the fraudulent concealment was as to Mr. Estes, the plaintiff. They didn't argue that in the district court? No, the district court argument, Your Honor, was that they fraudulently concealed from the doctor. And there was no evidence to support that the doctor would have done anything differently had he known that it had been cleared not by the marketed name, that it had only been cleared by the part number. So I would submit to the court that the plaintiff's attempt to state his state court claim as a fraudulent concealment on the plaintiff is not one that should be even considered by the court. And the district court found this is preempted by Buckman. The other cases, the Schultz case and the Hughes case and these other cases that have been cited, in all of those cases the courts found that there was an anchor in state law for the claim. Whether it was a claim that was for off-label use or in the Hughes case specifically when the court found that that claim, that the burning risk that presented, the one that was at issue in the case, was not one that was used with the product, that the only burning risk with that product in Hughes was the burning risk that was expected of the interior bleeding, not of an exterior bleed, I mean, I'm sorry, burning, not from an exterior burn from machine malfunction. And so those courts appropriately found that those risks that were not contemplated, whether it was at the FDA level, whether through their labeling there, that those risks were real failure-to-warn claims that could exist and that were anchored in state law. Here, in contrast, this is the Buckman example where the only basis is the sufficiency of the submission to the FDA. Whatever you want to label the claim, the substance is that we didn't do it right. We didn't sufficiently submit this to the FDA. Is it your position that the claim is based entirely on your client's misrepresentation to the FDA? It is our position that the fraudulent concealment claim, whether it is frankly to the physician or whether, and I think their position in their district court briefs was that we fraudulently concealed from the surgeon, the implanting surgeon, that we had not cleared this by the teluride, under the teluride independent clearance. Even though the parts had been cleared, that we didn't do an independent clearance with a system. Some of the parts. I'm sorry, Your Honor. Some of the parts. Some of the parts that were used in Mr. Estes, even though those parts had been cleared, all of them had been cleared, and that's undisputed, that is their position in terms of fraudulent concealment. Their position is not that we were fraudulently concealing from the FDA something about the submission, something about the submission. We were submitting to the FDA by part number, as is always done, and they cleared by part number. So that's the fraudulent concealment claim that existed at the district court level. I know that the plaintiffs are arguing now that it was fraudulent concealment to the plaintiff, but of the same thing, of the sufficiency or insufficiency of the FDA submission. I want to talk about the spoliation issue. Neither Lanx or the sales rep, Mr. Rasool, neither one of those entities, or neither the company nor Mr. Rasool, had the duty or the right to take possession of the broken screws that were removed from Mr. Estes in the revision surgery. It is true that Mr. Rasool was there, and no one is disputing that, but it is uncontested that he had no knowledge, no one is disputing that he didn't realize that there was a fractured screw at issue, and he didn't know that it was a Lanx fractured screw at issue. His testimony was that he was in the surgery for revision. He was selling the revision hardware, another company's hardware, and that was the purpose for surgery and that revision surgeries are done for a number of different reasons. He didn't know why this one was dying. And so the only person who had a right to take the possession of the screw is a surgeon, Dr. Crosby, and then, of course, the patient, Mr. Estes. We did not have a right to take that screw, nor did Mr. Rasool. Mr. Rasool, I want to distinguish his contractual obligation to the company is to report any customer complaints related to any kind of hardware failure. He has a contractual obligation to report those. That does not mean that he had some duty or right to take possession of the actual broken hardware. Did Lanx know it was broken hardware at the time of the surgery? Excuse me, Your Honor. Did Lanx know that? I mean, they had their representative there. He represented them at some point, but the new device was through another manufacturer, right? Yes, Your Honor. But did Lanx know that the screw that had failed was their product? Lanx became aware that that cantilated screw was a broken screw of a year later. Not at the time of the surgery? No, Your Honor. Nor did Mr. Rasool. And plaintiffs claim that he should have known, but the fact is he didn't know. He was not an employee. He was an independent contractor. He was an independent contractor, Your Honor. And he is not in the field of surgery in these cases. I mean, a sales rep for a pedicle screw device is not in the field of surgery. He was not in the field of surgery that day. He didn't realize there was a screw that was broken. And the doctor who was doing the revision surgery, there's no evidence that he indicated to Mr. Rasool that I'm removing a fractured screw and implanting another screw. And he certainly never reported to Lanx that he had removed a broken pedicle screw. So the district court found that spoliation cannot apply in this case because, one, the party has to have knowledge or should know, and we never had possession of the products. I mean, there were two broken pedicle screws. We didn't have possession of them. Mr. Rasool didn't have possession of them. There's no evidence that either Lanx, neither Lanx nor Mr. Rasool, knew that there was a broken pedicle screw. And therefore, there is no duty to preserve the evidence. If you don't have possession and you don't even know that there's a product malfunction, you have no duty. And even if you get beyond that analysis, and the district court went down each one of these, there has to be a bad faith. It can't just be negligent allowance of the destruction of the evidence or documents or what have you. So none of the requirements for spoliation were present in this case, and the district court appropriately found that spoliation did not exist. And it was doing so in the context of looking at the manufacturing defect claim. I can address the discovery issue. Our position is stated in the briefs. I do want to make clear for the court that there was some mention by counsel for Appalese of the torquing of screws and how that, if that happened and presented risk of broken screws, that that's something that they would have liked to have discovered, and they would have discovered it. Because we produced every single complaint in the history of the company of a broken pedicle screw, whether it was broken through instrumentation or whether it was broken through a patient falling. And so I want to make clear that every fractured screw that we knew about that has ever been reported to the company was produced in discovery. Well, the complaint was produced, not the screw. Not the screw. And the screw would have been produced had the plaintiffs asked for it. They never did. They never requested a screw. And so that was not a subject of the motion to compel. The only subject of the motion to compel was that we didn't produce non-pedicle screw parts that had broken and that we didn't produce 510K outside of the 510Ks that we produced. And I think we produced six 510K submissions. And so their complaint was 510K submissions that were submitted to the FDA for part clearance after this device and all the components that were used with this screw and all the components used. They thought the plaintiffs requested that they get those 510Ks. And the district court asked the plaintiffs to state a relevancy reason for both parts that had failed, fractured hardware other than the pedicle screws, and to state a relevancy argument for the 510Ks that had part numbers not related to all of these that were implanted in Mr. Estes. And their response to that was simply, we don't know what the relevance is until we get them. And our position is Rule 26 is not, and the district court found that was not a basis for compelling us to produce them, that there was no relevance and there was no stated relevance and that Rule 26 does not operate to allow the opposing side to get whatever they want to prove the other guy's not lying. So our position is it's an abusive discretion standard, as you know, and it's certainly not one that they can meet in this case. All right. Thank you. May it please the Court. Your Honor, first of all, I'd like to correct something. There was no 510K submission whatsoever for the Telluride system. We know that. You said that before. Rebuttals for rebuttal. And that's what I'm saying, Your Honor, because he just represented to this Court when I answered to Judge Weiner's question that there was a 510K. Well, there wasn't a 510K, and then we talk about parts and integrated systems. The Telluride spinal fixation system is not my classification nor is it my client's classification of this device. It's not my client's classification that it's an integrated device either. It's his classification that it's an integrated device, that we take these parts and we piece them together at the doctor's discretion. But that's not what they state in their statement of the case in their brief. They specifically state that he implanted the LANEX Telluride spinal fixation system, which includes pedicle screws. Not that Dr. Crosby implanted various parts he chose to decide, but that he implanted a fixation system. And that fixation system, in response to Judge Weiner's question, was never submitted for 510K approval as their 30B6. You got your dismiss claim, the fraudulent concealment claim, before a State court jury, and they found in your favor. Wouldn't that be really a finding by the State court jury that the system as a whole should have been submitted to the FDA? Not necessarily, Your Honor. And the reason it wouldn't be is because the fraudulent claim is not dependent on whether it was or it was not. The fraudulent claim is dependent on whether there was a material concealment, a concealment of a material fact, and that's what the jury would weigh, a State court jury would rule upon, and that's the facts. Whether or not there was a violation of the FDECA would just be a fact. But if they didn't need to get the whole system approved by the FDA, what was fraudulent about concealing that they didn't? I mean, it seems your whole argument is premised on the fact that they should have, but didn't get the whole system approved. And, Your Honor, on that issue, if there was a guideline that says they could submit this piecemeal approach to the FDA, they would have already cited that regulation by now, and they have not. Our experts testified specifically that they must submit a 510K for this. In fact, there's . . . And you might be right, but the whole point of Buckman is the FDA should be making those decisions, not State court juries. I disagree with you there, Your Honor. The Buckman decision is that we can't say that you defrauded the FDA. We can't go back through and look at your 510K submissions, your post-market approval, and any other documentation you submitted to the FDA to say that you lied or you misrepresented something to us. Okay? In that situation, Buckman relies upon misinformation to the FDA, whereas here we have no information at all, and there was a concealment of that material fact. That's what takes it into the State tort claim basis outside of the FDCA. In other words, Buckman here is applied too broadly and only will set bad precedent in the Fifth Circuit. In other words, what I'm saying is we have the Hughes v. Boston scientific case from 2011 that says just because you have a violation of the FDCA does not mean that it's impliedly preempted by Buckman. That's specific to what is said in the Hughes v. Boston scientific. That's the same argument that we're making here today. Estes' fraud claim exists in a world without the FDCA because we have a product manufacturer that is concealing a material fact, and it is a realistic fear that Mr. Estes would not want something that isn't FDA approved put into his body because we're talking about his spine. We're talking about his ability to walk, which is slowly debilitating with every day that goes by that he doesn't have somebody. But, Mr. Smith, so that's a new argument, that before you were arguing that the doctor wouldn't have put it in. That's also incorrect, Your Honor, because in my record excerpts, page 73 in our amended complaint, paragraph 59, in representations to consumers generally and to plaintiff Rocky Estes in particular, the defendant fraudulently concealed and intentionally omitted material information, including but not limited to a various litany of facts that we cited in our amended complaint. You did argue in the court below. Yes, Your Honor. I mean, I can't point to a specific recollection of what was exactly in our summary judgment briefs with the court, but I do know that it specifically stated in our complaint that Rocky Estes was defrauded. Here, with respect to the spoliation issue, there was a duty to preserve. While you referenced, Judge Weiner, that he's an independent contractor, he's still an agent of Lanik's. He's there. He's their man. And his testimony, his specific letter in my record excerpts is that I don't recall why I was there. If there was a revision, I didn't know about it. There's no obligation. He wouldn't have been allowed to take that equipment that was removed from a patient anyway. The surgeon's not going to turn over that kind of equipment to a company man. Your Honor, as long as the proper request is made, that is done, in fact. Do you have any evidence that that would have happened? Did you ask the surgeon whether he would have turned over the broken screw? No, Your Honor, we don't because his deposition took place before we ever found out about those issues. Thank you. Your red light's on.